Jeffrey J. **TIBURZI**, Petitioner,

v.

**DEPARTMENT OF JUSTICE,**
Respondent.

No. 01–3123.

United States Court of Appeals,
Federal Circuit.

DECIDED: Nov. 1, 2001.

Jeffrey J. Tiburzi, of Baltimore, MD, pro se.

Jeffrey A. Belkin, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, for respondent. With him on the brief were David M. Cohen, Director; and Todd M. Hughes, Attorney.

Before NEWMAN, CLEVENGER, and DYK, Circuit Judges.

DYK, Circuit Judge.

This case presents the question whether the parties intended an oral settlement agreement to be binding in the absence of a subsequent written settlement agreement. We hold that substantial evidence supports the conclusion that the parties intended to be bound by the oral agreement, without regard to any subsequent memorialization of its terms. We further hold that petitioner has made no showing that his counsel or the administrative judge coerced his acceptance of the agreement. We accordingly affirm the decision of the Merit Systems Protection Board ("MSPB" or "Board") in *Tiburzi v. Department of Justice,* No. PH–0752–00–0295–I–1, 87 M.S.P.R. 534 (M.S.P.B. Nov.13, 2000).

## BACKGROUND

Mr. Jeffrey J. Tiburzi ("petitioner") was employed as a Special Agent with the

Drug Enforcement Agency of the Department of Justice ("DEA" or "agency"). On the evening of June 28, 1999, petitioner consumed alcoholic beverages at his Baltimore home, and then continued to drink at a nearby bar, where several witnesses saw him shove another bar patron. Though petitioner was apparently unarmed at the time, the altercation led DEA Special Agent Anthony Oliver (who had accompanied petitioner to the bar) to draw his service weapon and point it at the bar patron and a bar employee. The bar employee in turn contacted the Baltimore Police Department, and police officers subsequently detained and questioned both petitioner and Special Agent Oliver. The report filed by the Baltimore police officers indicated that petitioner's speech was slurred and that he was staggering, and described his behavior as "cocky" and "combative."

On December 23, 1999, the agency sent petitioner a Notice of Proposed Removal from his position, based on three charges brought against petitioner arising from his conduct on the evening of June 28, 1999.[1] The agency based the first charge, "Conduct Unbecoming a DEA Special Agent," on petitioner's involvement in what the agency characterized as a "bar brawl," and his "unprofessional demeanor with the Baltimore Police Officers" investigating the altercation. The agency based the second charge, "Poor Judgment," on petitioner's consumption of alcohol to the extent that petitioner would be "unfit to return to duty, if necessary." Petitioner's conduct in this regard contravened agency policy on "Standards of Conduct Relating to Consumption of Alcohol." The agency based the third charge, "Making False Statements," on petitioner's allegedly false statements on October 4, 1999, to inspectors with the agency's Office of Professional Responsibility regarding his conduct at the Baltimore bar.

On December 28, 1999, the agency placed petitioner on administrative leave pending adjudication of the charges. In an April 25, 2000, letter to petitioner, the agency sustained all charges, and removed petitioner, effective "upon [petitioner's] receipt of this letter." Petitioner acknowledged receipt of the removal letter on May 1, 2000.

On May 24, 2000, petitioner (through counsel) appealed his removal to the Board, which referred the case to an administrative judge for adjudication. On July 20, 2000, the administrative judge held an evidentiary hearing on petitioner's appeal, during which time the parties also apparently entered into settlement negotiations.

On July 21, 2000, the administrative judge stated on the record that "the parties have entered into a settlement agreement" and invited the parties to "go through [on the record] the specific terms of the settlement agreement that the parties have agreed to." Petitioner's counsel, the self-described "scrivener" of the agreement, proceeded to read the terms of the agreement into the record. Under the agreement, petitioner agreed: to "resign from his position as a criminal investigator with DEA effective today [July 21, 2000];" to "not return to DEA or make any further [employment] applications to DEA;" and to "[w]ithdraw[ ] his appeal and waive[ ] basically any and all claims against the agency that could arise out of this matter." The . agency, in turn, agreed to provide a neutral reference on petitioner to potential future (non-law enforcement) employers and to state that he

1. It appears from the record that the agency also took disciplinary action against Special Agent Oliver. That action by the agency is not at issue here.

resigned from the agency "for personal reasons."

The hearing transcript indicates that all parties, including petitioner and his counsel, answered affirmatively the administrative judge's question whether the terms entered into the record "constitute all the terms of the settlement agreement." All parties likewise answered affirmatively the administrative judge's questions whether they each "understand the terms of the settlement agreement," and whether they "voluntarily enter into the settlement agreement."

The transcript also reflects that the parties considered the date of the hearing—July 21, 2000—to be the "date of the execution of this [settlement] agreement." Petitioner's counsel stated in pertinent part, for example, that:

> The terms [of the settlement agreement] are generally as follows. *Mr. Tiburzi will resign from his position as a criminal investigator with the DEA effective today, which is the date of the execution of the agreement, although we do contemplate that there will be a signed agreement.*

(Emphasis added.) The parties also agreed that "this oral representation of what the settlement agreement is and the written settlement agreement will become part of the record here and enforced, and enforceable by [the administrative judge]." The administrative judge, in turn, instructed that "a copy of the written settlement agreement will be faxed to my office" on or about July 26, 2000.

On July 27, 2000, the agency forwarded to petitioner's counsel a proposed written settlement agreement for his and petitioner's signature. That agreement memorialized the terms of the oral settlement agreement. The proposed written agreement, however, specified a resignation date of May 1, 2000 (the resignation date set forth in petitioner's SF–50 "Notification of

Personnel Action" form), as opposed to the July 21, 2000, resignation date agreed upon by the parties at the Board hearing.

Apparently neither petitioner nor his counsel responded to the agency's July 27, 2000, correspondence. On August 3, 2000, the agency again requested a signed copy of the agreement, and informed petitioner's counsel that the administrative judge was "seeking a signed copy [of the written agreement] for the Board's records as soon as possible." Although the agency and petitioner's counsel conferred telephonically on or about August 10, 2000, regarding a minor revision to the settlement agreement, neither petitioner nor his counsel appears to have signed the written agreement.

On August 23, 2000, the administrative judge dismissed petitioner's appeal as settled, on the grounds that the parties "lawful[ly] and voluntarily entered into" the oral settlement agreement, and that they "understand the terms" of that agreement:

> On July 21, 2000, the scheduled day of the hearing, the parties entered into an oral settlement agreement which has been placed into the record.... I have reviewed the terms of the settlement agreement and find it lawful and voluntarily entered into. The record reveals that the parties understand the terms of the settlement agreement and that they desire to make the settlement agreement enforceable by the Board.... Since the appeal has been settled before the Board has reached a decision on the matter, the appeal is dismissed from further consideration before this office.

*Tiburzi v. Dep't of Justice*, Docket No. PH–0752–00–0295–I–1, 87 M.S.P.R. 534 (M.S.P.B. Aug.23, 2000) ("*Initial Decision*").

Notwithstanding the dismissal of his appeal, petitioner continued to refuse to sign the written agreement, and on or about

September 20, 2000, petitioner's counsel informed the administrative judge that he no longer represented petitioner. Shortly thereafter, the agency advised the administrative judge that the withdrawal of petitioner's counsel did not "impact ... upon the effectiveness of the parties' settlement agreement," and that the agency "would immediately begin to fulfill [its] obligations in accordance with the agreement's terms."

On or about September 27, 2000, the petitioner filed a *pro se* petition for review of the administrative judge's Initial Decision. In that petition, Mr. Tiburzi requested that the settlement agreement be vacated and a new hearing granted, upon the grounds that he entered into the agreement under "duress and extreme coercion" by his counsel and by the administrative judge.

During the pendency of Mr. Tiburzi's petition for review, the agency (on or about October 20, 2000), revised petitioner's Notice of Termination form (SF–50), to delete any references to the charges brought against petitioner, and to state that he had resigned his position for personal reasons. The revised SF–50, however, provided a resignation date of May 1, 2000, rather than the July 21, 2000, resignation date set forth in the oral settlement agreement.

On November 13, 2000, the full Board denied the petition for review, concluding that "there is no new, previously unavailable, evidence and that the administrative judge made no error in law or regulation that affects the outcome" of Mr. Tiburzi's Board appeal. *Tiburzi v. Dep't of Justice,* No. PH–0752–00–0295–I–1, 87 M.S.P.R. 534 (M.S.P.B. Nov.13, 2000) ("Final Decision"). This timely *pro se* appeal followed.

## DISCUSSION

### I

 This court will affirm a decision of the Board unless we find it to be: "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence...." 5 U.S.C. § 7703(c); *Chase–Baker v. Dep't of Justice,* 198 F.3d 843, 845 (Fed.Cir.1999). The petitioner bears the burden of establishing error in the Board's decision. *See, e.g., Cheeseman v. Office of Pers. Mgmt.,* 791 F.2d 138, 140 (Fed.Cir.1986).

### II

 It is "axiomatic that a settlement agreement is a contract." *Greco v. Dep't of the Army,* 852 F.2d 558, 560 (Fed.Cir. 1988). And as we have previously recognized, "it is well-established that an oral settlement agreement is binding on the parties, particularly when the terms are memorialized into the record." *Sargent v. Dep't of Health & Human Servs.,* 229 F.3d 1088, 1090 (Fed.Cir.2000); *see also Goodwin v. Dep't of Treasury,* 983 F.2d 226, 228 (Fed.Cir.1992) (noting that an oral Board agreement "was valid and binding on the parties").

Mr. Tiburzi twice concedes in his informal brief that he "did enter into a settlement agreement with the [agency] as before [the administrative judge] in which I resigned my position as a Special Agent," and that he "did so on the court record." [2] But petitioner argues that the oral agreement should be set aside because he did not "sign or accept the official written agreement." In other words, Mr. Tiburzi

---

**2.** Elsewhere in his informal brief, petitioner concedes that "I realize that I did agree to the settlement on the record before the [adminis-trative] judge and that I must take responsibility for those actions."

argues that his acceptance of the oral agreement is not binding absent the parties' subsequent approval of a written memorialization of that agreement.

 Parties often enter into oral contracts with the understanding that a written contract will follow that merely memorializes the oral contract. It is well-settled under our cases that if no written agreement is forthcoming, the oral agreement still governs. In *Singer Co., Librascope Div. v. United States,* 215 Ct.Cl. 281, 568 F.2d 695 (1977), for example, one of our predecessor courts, the Court of Claims,[3] affirmed the trial court's determination that the government contractor was bound by its oral agreement with the government even though the contractor had "never submitted ... the signed letter of acceptance that had been requested" by the government. *Id.* at 707. In reaching that conclusion, the trial court reasoned in pertinent part that the contractor had not shown that the parties intended to "postpone a binding contractual commitment" until the execution of a "later written memorial of their agreement":

> Plaintiff points to nothing in the record to warrant the conclusion that either party intended to postpone a binding contractual commitment until evidence of their understanding had been formalized by way of a signed letter of acceptance. The Government's letter ... asked [the contractor] to signify its acceptance and exceptions by telegram, this then to be followed by a signed letter of acceptance. In its telegrammed response, [the contractor] noted its concurrence. These manifestations of assent were sufficient in themselves to conclude an agreement and *contract law would not inhibit such effect merely because the parties*

*may also have manifested an intention to prepare and adopt a later written memorial of their agreement.*

*Id.* at 707 (emphasis added).

In contrast, in *Mahboob v. Department of the Navy,* 928 F.2d 1126 (Fed.Cir.1991), on the particular facts of that case (discussed below), we concluded that the parties had *not* intended an oral settlement agreement (negotiated telephonically) to be binding until it was reduced to writing. Thus, we held that the oral agreement there was not a "final settlement of plaintiff's" claims that the agency had improperly removed her from her position. *Id.* at 1129.

In short, our cases make clear that where the parties intend to enter into an oral agreement, it is binding on the parties even if its terms are not embodied in a subsequent written instrument. Decisions of a number of our sister courts of appeals are in accord. *See Chedd–Angier Prod. Co. v. Omni Publ'ns Int'l, Ltd.,* 756 F.2d 930, 935 (1st Cir.1985) (affirming jury verdict that the parties "agreed upon the essential terms of the [oral] contract prior to memorializing the contract in writing"); *Int'l Telemeter Corp. v. Teleprompter Corp.,* 592 F.2d 49, 56 (2d Cir.1979) (affirming district court's decision that the parties entered into a binding oral settlement agreement "prior to signing and delivery of a written agreement").

Secondary sources provide further support for the proposition that an oral agreement between parties is binding even if the parties contemplate the execution of a later written agreement and no subsequent written instrument is in fact executed. Professor Williston states, for example, that:

---

**3.** We are bound by the decisions of the Court of Claims "announced before the close of business on September 30, 1982." *South*

*Corp. v. United States,* 690 F.2d 1368, 1370 (Fed.Cir.1982) (en banc).

[W]here it was understood that the contract should be formally drawn up, and put in writing, *the transaction is nevertheless complete and binding, absent a positive agreement that it should not be binding until so reduced to writing and formally executed.* This is the position adopted by both *Restatements [of Contracts]*, the drafters recognizing that, though the parties may intend to memorialize their agreement, the memorial is not necessary in the absence of a statute requiring it.

1 Samuel Williston, *Williston on Contracts* § 4:8, at 300–302 (4th ed.1990) (emphasis added).

Similarly, the *Restatement (Second) of Contracts* (1981) makes clear that:

Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but the circumstances may show that the agreements are preliminary negotiations.

*Id.* at § 27.[4]

 Under existing law, an oral agreement is binding absent a showing that the parties "did not intend to be bound until a written contract was signed." *Sargent*, 229 F.3d at 1090. There is no such showing here, as petitioner himself appears to concede. Moreover, the hearing transcript shows that the parties intended to achieve a settlement agreement on the date of the hearing. Counsel for petitioner, for example, informed the administrative judge that petitioner would resign "effective today, *which is the date of the execution of the agreement,* although

we do contemplate that there will be a signed agreement" (emphasis added). The balance of the hearing transcript also shows that the parties and the administrative judge understood that a complete, binding agreement had been reached. Indeed, the administrative judge asked the parties four times whether the terms entered into the record "constitute all the terms of the settlement agreement," and all parties (including Mr. Tiburzi) answered in the affirmative. Finally, all parties agreed that both the oral agreement and any subsequent written memorialization would be enforceable by the Board. Counsel for petitioner, for example, informed the administrative judge in pertinent part that the "oral representation of what the settlement agreement is and the written settlement agreement will become part of the record here and enforced, and enforceable by Your Honor."

The dissent suggests that the settlement agreement was invalid because the DEA attorney lacked authority to enter into the agreement. But there was no allegation below that the DEA attorney lacked that authority, and no evidence that she did. The DEA attorney's statement that she voluntarily entered into the settlement agreement "to the extent [she] count[s] as agency counsel" suggests only that she was not personally bound by the settlement agreement, and not, as the dissent submits, that she lacked authority to enter into the agreement on the agency's behalf. Likewise, the DEA attorney's promise to return to petitioner a signed copy of the agreement once she "obtained an original signature on behalf of the Agency" does not suggest a lack of authority to enter into an oral settlement agreement, particu-

4. *See also, e.g.,* 1 Arthur L. Corbin, *Corbin on Contracts* § 30, at 110 (1963) ("The evidence may be convincing that the parties intend to reduce their already consummated [oral] contract to writing as a mere 'memorial' thereof and not as their only operative expression of assent. *In such a case, the contract is valid even though they try and fail to agree upon the form and terms of the memorial.*") (emphasis added).

larly when she repeatedly represented to the administrative judge that "the parties have entered into a settlement agreement." To construe statements such as those relied on by the dissent as indicating a lack of authority would call into question a wide range of valid settlements, to the detriment of both the United States and agency employees.

In sum, substantial evidence shows that the parties intended the oral settlement agreement to be binding and enforceable even absent the execution of a subsequent written agreement.

 This situation is quite different from the facts of *Mahboob v. Department of the Navy,* 928 F.2d 1126 (Fed.Cir.1991), where we concluded that the parties there had not intended an oral settlement agreement (negotiated telephonically) to be binding until it was reduced to writing. At the outset, we recognize that the written agreements in *Mahboob* and this case could arguably be distinguished based upon the language of their respective integration clauses. The written contract at issue in *Mahboob* contained an integration clause that stated in pertinent part that "[t]here are no other agreements between the parties, either express or implied, oral or written." *Id.* at 1129. The written agreement here does not explicitly refer to "other [oral] agreements between the parties."[5] *Id.* But this arguable distinction is irrelevant. All well-drafted contracts contain integration clauses. And the term "integration clause" is in turn defined as "[a] contractual provision stating that the contract represents the parties' complete and final agreement *and supersedes all informal understandings and oral agreements* relating to the subject matter of the contract." *Black's Law Dictionary* 812

(7th ed.1999) (emphasis added). Thus, an integration clause by definition disposes of prior "oral agreements," and the stylistic differences in the integration clauses here are not grounds upon which to distinguish *Mahboob* from this case. There are, however, material differences between this case and *Mahboob.*

Here, unlike *Mahboob,* the record itself reflects petitioner's explicit acceptance of the oral agreement. Also, the written settlement agreement at issue in *Mahboob,* drafted by the Navy and sent to petitioner, was "almost completely different from the terms discussed in the telephone conference," in that it contained "various new terms of settlement that were not even mentioned in the telephone conference." *Mahboob,* 928 F.2d at 1129.

The written agreement in this case, in contrast, was by no means "almost completely different" from the oral agreement reached at the Board hearing. *Id.* Rather, the parties at the hearing specifically agreed to the material provisions of the agreement.

 We do note that the written agreement drafted by the agency contains one arguably material change from the oral agreement, in that the written agreement (and revised SF–50) specifies an earlier resignation date for Mr. Tiburzi (May 1, 2000) than did the oral agreement (July 21, 2000). But the agency's mere proposal of a different resignation date in its July 27, 2000, draft of the written agreement does not require the invalidation of the entire oral settlement agreement. Rather, the July 21, 2000, resignation date set forth in the oral agreement continues to govern. *See* 1 Arthur L. Corbin, *Corbin on Contracts* § 30, at 110 (1963) ("After-

---

5. The integration clause in the written agreement at issue here states in pertinent part that "[t]his [written] [a]greement represents the full and complete agreement of the parties hereto. No other promises or agreements will be binding unless placed in writing and signed by both parties."

thoughts cannot be brought into the contract except by mutual assent; and the informal contract stands as made.").

## III

Mr. Tiburzi next argues that the oral agreement should be set aside because his counsel and the administrative judge "coerced and intimidated me into the agreement." We cannot agree, as petitioner does not provide, and the record does not otherwise disclose, evidence to support his allegations of coercion.

■ As we have previously noted, "[t]hose who employ the judicial appellate process to attack a settlement through which controversy has been sent to rest bear a properly heavy burden" of proof that the agreement was improperly obtained. *Asberry v. United States Postal Serv.*, 692 F.2d 1378, 1380 (Fed.Cir.1982); *see also Sargent*, 229 F.3d at 1091 ("It is well-established that in order to set aside a settlement, an appellant must show that the agreement ... was involuntary....").

■ A bare allegation of coercion is not sufficient to set aside the parties' settlement agreement. Rather, Mr. Tiburzi must make a "showing of wrongful conduct necessary to shift the burden of proof on the allegation" of the attorney's and administrative judge's coercion from himself to the agency. *Asberry*, 692 F.2d at 1381. Petitioner has made no such showing of "wrongful conduct" here. He provides only unsubstantiated allegations that his counsel and the administrative judge made certain statements to him off the record during the hearing to coerce his acceptance of the oral agreement. Those alleged statements appear to include appraisals by petitioner's counsel and the administrative judge of the merits of petitioner's appeal.

Even if those statements were made, they would not be sufficient to invalidate the oral agreement. Mr. Tiburzi had to choose at the hearing between unpleasant alternatives: resigning from the agency under the terms of the oral agreement, or facing the (likely) rejection of his Board appeal and the resulting removal for cause from his position by the agency. We have repeatedly recognized that "an employee's dissatisfaction with the options that an agency has made available to him is not sufficient to render his decision to resign or retire involuntary." *Carpenter v. Merit Sys. Prot. Bd.*, 111 F.3d 118, 121 (Fed.Cir. 1997); *see also, e.g., Schultz v. United States Navy*, 810 F.2d 1133, 1136 (Fed.Cir. 1987) ("[W]here an employee is faced merely with the unpleasant alternatives of resigning or being subject to removal for cause, such limited choices do not make the resulting resignation an involuntary act."). That principle is applicable here.

In short, the evidence leads us to conclude that petitioner has not presented substantial evidence that his counsel or the administrative judge coerced petitioner's acceptance of the oral settlement agreement.

## CONCLUSION

We conclude that substantial evidence supports the conclusion that the parties intended to make the July 21, 2000, oral agreement binding and enforceable. We further conclude that the petitioner has not shown that his counsel or the administrative judge coerced his acceptance of the oral agreement. We therefore affirm the decision of the Merit Systems Protection Board.

*AFFIRMED*

## COSTS

No costs.

PAULINE NEWMAN, Circuit Judge, dissenting.

This appeal is not about whether Mr. Tiburzi was "cocky" and/or drunk on the evening of June 28, 1999. Nor is it about whether his conduct warranted his being fired. It is about how the Merit Systems Protection Board and the agencies administer their obligations to federal employees. It is about the principles of settlement agreements, and the laws of contracting with the government. It is also about fundamental fairness in administrative adjudication.

Although the majority opinion states that "apparently" Mr. Tiburzi and his counsel did not sign the written settlement proposal, it is crystal clear that they did not. It was undisputed that Mr. Tiburzi disclaimed the settlement almost immediately after the July 21 hearing, and that the agency was not bound until an authorized person agreed and signed the settlement agreement. Not until after September 20 did the agency tell the administrative judge that it would perform the oral obligations that the majority now rules were irrevocably binding on Mr. Tiburzi on July 21. The agency had taken no steps whatsoever to implement the July 21 terms; instead the agency proffered different written terms, changing the date of Mr. Tiburzi's enforced resignation to three months earlier than the date that was entered into the record on July 21. These events negate the majority's theory that the July 21 oral events constituted an irrefutable and mutually binding contract.

Both parties must be bound, to make a contract. The agency made clear that it was not bound without a written agreement; the mutual intention of a written agreement was placed in the MSPB record. When the agency a week later sent its "proposed settlement agreement" with significantly changed terms, this was fur-

ther demonstration that the agency did not deem itself bound by the oral terms. It is standard contract law that if the July 21 agreement did not bind the agency, it did not bind Mr. Tiburzi. This court's retroactive creation of an "agreement" that did not exist at the time it purportedly was made is contrary to the law of contracts.

The document called a "proposed settlement agreement" by the agency, sent to Tiburzi's then lawyer on July 27, contained twenty enumerated paragraphs. At least sixteen of these paragraphs contained terms that were not mentioned at the July 21 hearing. It was not signed on behalf of the agency. The covering letter from the agency attorney invited "questions, comments, etc.," and stated that the agency's attorney would obtain execution on behalf of the agency after it was signed by Mr. Tiburzi. Neither the proposed settlement agreement nor the covering letter mentioned the MSPB hearing or any purported prior oral contract. The proposed settlement agreement was by its terms the "full and complete agreement," expressly negating any unwritten and unsigned promises or agreements, as set forth in the following clauses:

¶ 1. The parties do hereby agree to settle and compromise this action upon the terms indicated below.

¶ 15. This Agreement represents the full and complete agreement of the parties hereto. No other promises or agreements will be binding unless placed in writing and signed by both parties.

¶ 18. The parties agree that this settlement agreement will be filed with the MSPB, which will retain jurisdiction of the matter only for the purpose of enforcing the terms of this agreement.

¶ 20. This agreement will be deemed to be fully executed upon the date that the last of the parties, or parties' representatives, affixes his/her signature hereto.

The proposed settlement agreement included many provisions in addition to those recorded at the oral hearing. Some of these provisions could be viewed as details, as does the panel majority, but not all. It was a significant change that the proposed agreement set a resignation date of May 1, 2000, whereas a resignation date of July 21, 2000 was read into the record at the oral hearing. Almost three months' employment is not an immaterial detail. Also, new provisions at ¶¶ 4, 5, 6, and 7 defined the agency's obligations with respect to future employers, and ¶ 9 defined Mr. Tiburzi's non-admission of culpable behavior.

On August 3, 2000 the agency's counsel again wrote to Mr. Tiburzi's counsel, inquiring as to the status of the proposed settlement agreement. The letter stated that counsel had "received several phone calls from Administrative Judge Fishman regarding the status of the agreement and seeking a signed copy for the Board's records as soon as possible." The agency was continually informed that Mr. Tiburzi refused to sign the document, as was the administrative judge. Nonetheless, on August 23, 2000 the administrative judge dismissed the appeal as settled at the July 21 hearing, entering an order stating that "I have reviewed the terms of the settlement agreement and find it lawful and voluntarily entered into" and that "the parties desire to make the settlement agreement enforceable by the Board." The administrative judge's statements are not comprehensible, in view of his knowledge of Mr. Tiburzi's total rejection of the settlement.

Perhaps cognizant of this irregularity, the agency continued to try to obtain Mr. Tiburzi's signature. Mr. Tiburzi steadfastly refused to sign the document. The agency so wrote the administrative judge on September 18, 2000, and by letter dated September 21 the agency wrote the AJ that it "would immediately begin to fulfill our obligations" under the oral "settle-

ment." Even then, the agency did not implement the resignation date of July 21, the date recorded at the hearing.

Mr. Tiburzi appeals here *pro se*. In his *pro se* brief he acknowledges that he "agreed" to settle at the oral hearing. He also states that he did not "sign or accept the official written agreement" and that "[a]t the first opportunity after the settlement agreement, I contacted my attorney and expressed to him that I was coerced and I wanted to fight the agreement." My colleagues take this as an "admission" that he was bound on July 21.

Mr. Tiburzi indeed stated on July 21 that he agreed to settle by resigning. He also agreed to a July 21 resignation date. He also agreed that the terms would be set forth in a written and signed agreement. The agency's ensuing actions make clear that the agency did not deem itself bound by the oral terms; indeed, the written proposal explicitly negated any unwritten and unsigned promises or agreements.

Absent mutuality of obligation, a contract does not come into being. The majority's heavy reliance on Mr. Tiburzi's "admissions" in his *pro se* brief can not overcome this failure of mutuality. *See Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (*pro se* complaints are held "to less stringent standards than formal pleadings drafted by lawyers"); *Roche v. United States Postal Serv.*, 828 F.2d 1555, 1558 (Fed.Cir.1987) ("*Pro se* petitioners are not expected to frame issues with the precision of a common law pleading.").

Precedent requires the ruling that these oral MSPB proceedings did not constitute a binding mutual agreement. The case of *Mahboob v. Department of Navy*, 928 F.2d 1126 (Fed.Cir.1991), in which this court addressed the question of the finality of an oral settlement when the petitioner refused to sign a written agreement, is close

to this one on its facts, and its controlling principle of law can not be ignored. In *Mahboob* the petitioner and the petitioner's attorney, the Navy's attorney, and the MSPB administrative judge participated in a telephonic hearing. The petitioner's attorney and the Navy's attorney agreed to certain settlement terms, the petitioner apparently remaining silent. They agreed that a written contract would be prepared by the Navy's attorney. The conversation was tape recorded and the tape was entered into the record and transcribed. The petitioner then rejected the settlement and refused to sign the written contract. The Navy contended that the refusal to sign was irrelevant, and that the oral exchange constituted a final and enforceable contract.

The Federal Circuit disagreed. The court explained that "[t]he most convincing evidence that the telephone conference was not a final settlement of plaintiff's case, and that a written document signed by both parties was required, was the fact that . . . the Navy's attorney . . . prepared such a written settlement agreement, signed it and sent it to the plaintiff for her consideration and signature." *Mahboob*, 928 F.2d at 1129. Similar events occurred in Mr. Tiburzi's case: the parties orally agreed to settle and a record was made by the administrative judge, stating that a writing and signing were intended; a written agreement was then prepared by the agency and rejected by the petitioner.

The rejected agreement in *Mahboob*, as for Mr. Tiburzi, stated that the writing "constitutes the complete agreement of the parties" and that no other agreements are binding unless in writing and signed. The *Mahboob* court held that this statement "effectively forecloses the Navy's contention that the telephone oral conference was a final settlement of plaintiff's case." *Id.* at 1129. This holding is fully applicable to Mr. Tiburzi. As also discussed in *Mah-*

*boob,* a material change by the agency in the later written document from the terms orally discussed shows that the oral event was not viewed by the agency as a final and binding contract. *Id.*

The panel majority finds that this case is distinguishable from *Mahboob* because Mr. Tiburzi said on July 21 that he understood the settlement terms and voluntarily agreed to settle. This is not a distinction from *Mahboob*, for the Federal Circuit's decision in *Mahboob* did not depend on whether the petitioner personally spoke for the record. In both cases, it was agreed and expected that a signed written agreement was necessary.

An oral "understanding" does not create a binding contract when the parties intend and explicitly state that the settlement will be placed in writing and signed. The submission of the proposed settlement agreement for Mr. Tiburzi's approval confirms the mutual intention that a written and signed agreement was necessary to settle the case. The agency repeatedly described this document as a "settlement agreement draft" even during Mr. Tiburzi's appeal to the full Board. *See* attorney Declaration ¶ 11 ("I revised the parties' settlement agreement draft to incorporate this sole requested change. . . ."). The conclusion that the agency did not view the oral arrangement as binding is reinforced by the provisions of the proposed written agreement, which state that it is the "full and complete agreement" and that "no other promises or agreements will be binding unless placed in writing and signed by both parties." The analogy to *Mahboob* is complete, and is binding precedent.

As a matter of contract law, an initial statement of general terms is not a final contract, but a statement of intention or prospect. In the words of the *Restatement (Second) of Contracts* § 27 (1981) comment b:

[I]f either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been reduced to another written form, the preliminary negotiations and agreements do not constitute a contract.

The panel majority's multiple citations to treatises of contract law do not relate to contracts with the government, where even written agreements do not come into effect unless within the agency's and the signer's express authority; the DEA attorney expressly warned that she could not bind the agency. Although the majority opinion takes issue with the view that the agency counsel was not authorized to enter into a binding oral or indeed written settlement, the agency counsel herself was of this view. Note the answer to the administrative judge's question "do you voluntarily enter into the settlement agreement?" She said: "Yes. To the extent I count as agency counsel, yes." This qualified answer reflects the rule that an agency is not bound until an authorized official has accepted the contract. The proposed agreements that the attorney sent to Mr. Tiburzi's attorney were not signed for the agency, and counsel made clear that they would be signed only after Mr. Tiburzi signed them. The changed terms of the written agreement are powerful evidence that the agency did not deem itself bound to the oral terms.

Professor Corbin's discussion of "informal contracts" has no relevance to contracts with the United States. Indeed, authority not involving the United States as a contracting party is irrelevant, for it is a truism that written agreements signed by authorized persons are essential to settle litigation with agencies of the United States. *See generally* John Cibnic, Jr. & Ralph C. Nash, Jr., *Formation of Government Contracts* 80–83 (3d ed.1998). Unlike private agency law, enforceable government contracts require actual authority of the agent. The Supreme Court confirmed this principle in *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947):

> Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power. And this is so even though, as here, the agent himself may have been unaware of the limitation upon his authority.

*Id.* at 383. In *Mil–Spec Contractors, Inc. v. United States*, 835 F.2d 865 (Fed.Cir. 1987), this court confirmed that a valid oral settlement agreement with the government did not exist when the negotiator did not have the authority to bind the government to the settlement. *Id.* at 867. The majority's reliance on *Chedd–Angier Prod. Co. v. Omni Publications Int'l, Ltd.*, 756 F.2d 930 (1st Cir.1985) and *International Telemeter Corp. v. Teleprompter Corp.*, 592 F.2d 49 (2d Cir.1979) is inapposite because these cases do not involve contracts with the United States.

The other cases cited by the majority are also inapt. The citation of *Singer v. United States*, 215 Ct.Cl. 281, 568 F.2d 695 (1977) does not support the majority's position, for in *Singer* the contractor sent a telegram stating its acceptance of the contract; surely that is a "signed acceptance," not an "oral agreement" as the majority describes it. In *Sargent v. Dep't of Health & Human Services*, 229 F.3d 1088 (Fed. Cir.2000), there was no intention to reduce a settlement agreement to writing for signature, as in this case. Nor was there any

evidence, as in this case, that the agency did not view the oral terms as binding. The panel majority also cites *Goodwin v. Dep't of Treasury,* 983 F.2d 226 (Fed.Cir. 1992), but the validity of an oral contract was not at issue; the issue was whether the agreement had been breached. These cases provide no support for the majority's position, and do not override the direct and powerful precedential force of *Mahboob.*

Thus I must, respectfully, dissent. Mr. Tiburzi and the agency did not complete a settlement, and the MSPB violated its responsibility in dismissing the appeal.