# United States Court of Appeals for the Federal Circuit

04-1151


STEWART LAMLE,

                              Plaintiff-Appellant,

v.

MATTEL, INC.,

                              Defendant-Appellee.




       Stewart Lamle, of Santa Monica, California, pro se.

       Steven M. Anderson, Quinn Emanuel Urquhart Oliver & Hedges, LLP, of Los Angeles, California, for defendant-appellee. With him on the brief were Randa A.F. Osman and Patrick M. Shields.

Appealed from:   United States District Court for the Central District of California

Judge Terry J. Hatter, Jr.

# United States Court of Appeals for the Federal Circuit

04-1151

STEWART LAMLE,

Plaintiff-Appellant,

v.

MATTEL, INC.,

Defendant-Appellee.

_____

DECIDED:    January 7, 2005

_____

Before NEWMAN, CLEVENGER, and DYK, Circuit Judges.

Opinion for the court filed by Circuit Judge DYK.  Dissenting opinion filed by Circuit Judge NEWMAN.

DYK, Circuit Judge.

Appellant Stewart Lamle ("Lamle") appeals from the judgment of the United States District Court for the Central District of California granting summary judgment in favor of Appellee Mattel, Inc.  Because we find that there are genuine issues of material fact as to the contract claim, we vacate the grant of summary judgment and remand for further proceedings as to the contract claim.  We affirm the district court's grant of summary judgment as to the other claims.

## BACKGROUND

Lamle's contract claim is at the heart of this appeal.  We describe only the relevant facts concerning this claim.  The summary judgment record, taken in the light most favorable to Lamle, shows the following:

Lamle is the inventor of Farook, a board game similar in some respects to Tic Tac Toe. In 1994 and 1995, Lamle obtained two patents for Farook from the United States Patent and Trademark Office, U.S. Patent Nos. 5,308,080 and 5,419,564.

From May 1996 to October 1997, Lamle and Mattel, Inc. and its subsidiary J.W. Spear & Sons PLC (collectively "Mattel") were engaged in negotiations regarding the licensing of Farook by Mattel for distribution outside the United States. Early in these negotiations, Lamle signed Mattel's standard Product Disclosure Form (the "Disclosure Form"), which contained the following provision:

> I understand that . . . no obligation is assumed by [Mattel] unless and until a formal written contract is agreed to and entered into, and then the obligation shall be only that which is expressed in the formal, written contract.

(Def. App. at 103.)

During the negotiations, on March 18, 1997, Lamle and Mattel entered into a written agreement where Mattel paid $25,000 for Lamle's promise not to license Farook to anyone else until after June 15, 1997. The agreement provided that "[t]he payment of US $25,000 would be considered as an advance against royalties if, subsequent to this agreement, a royalty contract for FAROOK is entered into between Mattel and Stewart Lamle." (Def. App. at 111.)

The negotiations advanced, and a meeting was held in England on June 11, 1997 (the "June 11 meeting"), where the parties discussed the terms of a licensing agreement. At the meeting, Mattel and Lamle agreed on many terms of a license including a three-year term, the geographic scope, the schedule for payment, and the percentage royalty. Mattel asked Lamle to "draft a formal document memorializing 'The

Deal'" and "promised [that] it would sign a formal, written contract before January 1, 1998." (Pl. App. at 59.)

Mattel employee Mike Bucher ("Bucher") subsequently sent Lamle an email entitled "Farook Deal" on June 26, 1997 (the "June 26 email"), that substantially repeated terms agreed to at the June 11 meeting. The email stated that the terms "ha[ve] been agreed in principal [sic] by . . . Mattel subject to contract." (Pl. App. at 153.) The salutation "Best regards Mike Bucher" appears at the end of the email. (Id.)

On August 13, 1997, Mattel sent Lamle a fax stating that it was "waiting . . . for a draft licensing agreement." Lamle replied with a draft licensing agreement (the "Draft Agreement") which he faxed to Mattel on August 19, 1997. He sent a second draft with minor corrections to Mattel on September 13, 1997. Neither was ever signed by Mattel.

In the meantime, Mattel was also preparing Farook for presentation at its Pre-Toy Fair, which was held in Arizona in the August of 1997. The Pre-Toy Fair is a private show that Mattel holds to ascertain interest for potential toys among its "subsidiaries and select customers" from around the world. (Def. App. at 115.) The purpose of the Pre-Toy Fair is to determine if the subsidiaries and customers are interested in the toy, not to actually sell the product during the fair. (Def. App. at 116.) Lamle provided samples of the Farook game to Mattel for display at the Pre-Toy Fair, which Mattel then displayed.

After the Pre-Toy Fair, however, Mattel concluded that it did not wish to license Farook. Thereafter, Mattel attempted to notify Lamle by email on October 1, 1997.

However, Mattel could not reach Lamle by email. On October 8, 1997, Mattel notified Lamle of its decision by fax sent to Lamle at the office of Jake Sobotka, a

04-1151                                    3

business associate of Lamle's. The fax arrived while Lamle was present at the Sobotka office attending a meeting with potential investors.

Lamle filed this action in the United States District Court for the Central District of California on October 8, 1999, asserting, inter alia, claims of breach of contract, patent infringement, and intentional interference with economic relations. Lamle's later motion for leave to amend his complaint to add a claim of fraud was denied. The district court granted summary judgment in favor of Mattel on all claims on August 28, 2001. On May 6, 2003, we vacated that grant of summary judgment and remanded to the district court because we could "neither discern the grounds on which the district court granted summary judgment nor be certain that there [were] no genuine disputes of material fact." Lamle v. Mattel, Inc., 65 Fed. Appx. 293, 293 (Fed. Cir. 2003). In that opinion, we stated:

> We do not hold that any of the above are actually genuine disputes of material fact that preclude summary judgment. But neither can we confidently conclude that Lamle has presented no evidence that would entitle him to a trial on any of his three articulated theories of relief. While we think some of Lamle's arguments are more meritorious than others, we will not usurp the role of the district court by imposing our own views about which, if any, of Lamle's claims necessitate further factual development or a trial on the merits.

Id. at 296.

The district court on remand again granted summary judgment in favor of Mattel on all claims. Its order and judgment listed six grounds for its decision, each being one sentence long, with no citations to any case or to the record, and providing no explanation as to the facts or law upon which it was relying. Lamle v. Mattel, Inc., 99-CV-10410 (C.D. Cal. Nov. 25, 2003). Lamle appeals again to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

04-1151                                4

DISCUSSION

Lamle's claim for breach of contract was rejected by the district court. The district court found that no reasonable juror could find that a contract existed between the parties, and that, in any event, the contract claim was barred by the California Statute of Frauds, Cal. Civ. Code § 1624 (2004). We disagree.

I

On procedural issues not unique to this circuit's jurisdiction, we apply the law of the regional circuit. Genentech, Inc. v. Amgen, Inc., 289 F.3d 761, 768 (Fed. Cir. 2002). The grant of summary judgment for breach of contract claims is reviewed without deference. Hamilton v. State Farm Fire & Cas. Co., 270 F.3d 778, 782 (9th Cir. 2001). We view the evidence in the light most favorable to the nonmoving party, here being Lamle. Summers v. A. Teichert & Son, Inc., 127 F.3d 1150, 1152 (9th Cir. 1997).

We apply the substantive contract law of California, including the choice of law rules. A choice of law analysis is unnecessary here, however, because both parties argued the motion for summary judgment in the district court under California contract law.[1] Therefore, we proceed on the basis that California common law of contract applies, as modified by statute.[2]

---

[1] Lamle now argues on appeal that New York contract law governs this case under a choice of law provision in the draft contract he submitted to Mattel. Appellant Br. at 28-29. Because Lamle first raised this issue on motion for reconsideration in the district court, the choice of law issue is waived. Intercontinental Travel Mktg. v. FDIC, 45 F.3d 1278, 1286 (9th Cir. 1994) ("Raising an issue for the first time on motion to reconsider is not considered adequate preservation of the issue at a summary judgment stage."); see also Brazil v. United States Dep't of the Navy, 66 F.3d 193, 198-99 (9th Cir. 1995) (argument not raised below is waived, even where party is acting pro se).

[2] Lamle argues that the Uniform Commercial Code applies because the licensing of Farook is a contract for the sale of "goods" under U.C.C. § 2-102. This is

04-1151                                                      5

We conclude that a genuine issue of material fact exists as to whether the parties agreed to a contract at the June 11 meeting. Whether a contract is formed depends on the mutual assent of the parties as determined by the objective expressions of the parties. Zurich Gen. Accident & Liab. Assurance Co. v. Indus. Accident Comm'n, 22 P.2d 572, 573 (Cal. 1933). In his affidavit, Lamle asserts that the June 11 meeting was to "finalize 'the deal'" and that at the meeting, "Bucher, Vice President of Mattel, who stated that he was acting for Mattel, made an oral agreement with [Lamle] to license Farook . . . . [The parties] agreed that there were no material points left to be negotiated and shook hands on 'The Deal.'" (Pl. App. at 59 (emphasis in original).) The "deal" allegedly concluded at the June 11 meeting is said to include an agreement to manufacture and market Farook to Europe and other territories such as Australia and New Zealand, with a guarantee of 200,000 sales per year for three years, and for Mattel to manufacture Farook for Lamle to distribute in territories including the United States. The "deal" is also alleged to include an agreement that Mattel would pay $150,000 at the time of the signing of a written contract and an additional $200,000 advance by the end of January 1998, against a royalty rate of 15%.

On the other hand, Bucher's email on June 26 outlining these agreed terms stated that they were "agreed in principal [sic] by . . . Mattel subject to contract." (Pl. App. at 153.) Bucher submitted an affidavit stating that "the purpose of the June [11] meeting was to develop new packaging and marketing approaches for the game," that

---

manifestly incorrect, since a license for intellectual property, including a license for a patent, is not a sale of goods. Novamedix, Ltd. v. NDM Acquisition Corp., 166 F.3d 1177, 1182 (Fed. Cir. 1999).

the parties only "discuss[ed] possible terms for a licensing agreement," and Bucher repeatedly informed Lamle that "such licensing agreements take time to be finalized," the parties were only "begin[ing] the negotiations, . . . the terms of the licensing agreement would have to be approved," and "whether . . . Mattel entered into a licensing agreement depend[ed] on whether the Mattel affiliates were interested in distributing Farook." (Def. App. at 107-08.)

We think that there is a genuine issue of material fact. A jury may reasonably conclude that, had Bucher made such representations as Lamle alleges, and not as Mattel contends, there would be a sufficient objective manifestation of mutual assent to support an oral contract. Contrary to the dissent, we do not suggest that the June 26 email itself qualifies as an agreement. Rather, the question is whether an agreement was reached during the June 11 meeting.

Neither the fact that the Disclosure Form could be construed as requiring that future agreements be in writing nor the fact that the parties contemplated executing a formal writing after the June 11 oral agreement is conclusive as to the parties' intent. Parties may abrogate a prior written agreement with a subsequent oral one, if they so mutually intend. McKeon v. Giusto, 280 P.2d 782, 783-84 (Cal. 1955); Pearsall v. Henry, 95 P. 159, 160 (Cal. 1908).[3] Under California law it is well settled that the intent to abrogate an earlier written agreement can be inferred from the fact of a later oral agreement. McCreary v. Mercury Lumber Distributors, 268 P.2d 762, 768 (Cal. Ct. App. 1954) ("[R]escission by mutual agreement may be inferred from . . . testimony that a

---

[3] We note in this respect that the parties are not free to modify their prior written contract by a subsequent oral one. Cal. Civ. Code § 1698 (2004). Therefore, to

new agreement was reached."). So too it is clear that the fact that an ultimate written agreement was contemplated at the time of the oral agreement is not dispositive. The principle is succinctly stated by <u>Banner Entertainment, Inc. v. Superior Court of Los Angeles County</u>, 72 Cal. Rptr. 2d 598, 603-04 (Cal. Ct. App. 1998):

> When it is clear . . . that both parties contemplated that acceptance of the contract's terms would be signified by signing it, the failure to sign the agreement means no binding contract was created. . . . On the other hand, if the respective parties orally agreed upon all of the terms and conditions of a proposed written agreement with the mutual intention that the oral agreement should thereupon become binding, the mere fact that a formal written agreement . . . has not yet been signed does not alter the binding validity of the oral agreement.

(citations omitted); <u>see also</u> <u>Tiburzi v. Dep't of Justice</u>, 269 F.3d 1346, 1352 (Fed. Cir. 2001). "The question as to whether an oral agreement, including all the essential terms and conditions thereof, which according to the mutual understanding of the parties is to be subsequently reduced to writing, shall take effect forthwith as a completed contract <u>depends on the intention of the parties</u>, to be determined by the surrounding facts and circumstances of a particular case." <u>Thompson v. Schurman</u>, 150 P.2d 509, 513 (Cal. Ct. App. 1944) (emphasis in original). In this case we do not hold as a matter of law that the earlier Disclosure Form agreement was abrogated or that a binding oral agreement was reached on June 11. We hold only that a trial is required to determine the parties objectively manifested intent in these respects.[4]

---

prevail, Lamle must prove that the parties agreed to completely abrogate their prior written agreement.

[4] There may also be a question as to whether the Disclosure Form agreement was intended to bar all subsequent oral agreements, or only oral agreements concerning the "submission" of the idea. <u>See</u> (Def. App. at 103.)

Mattel also contends, and the district court held, that any oral agreement made during the June 11 meeting cannot be enforced because of the California Statute of Frauds, Cal. Civ. Code § 1624(a)(1).

There is no question that the alleged oral agreement for a three year license was one that, by its terms, could not be "performed within a year from the making thereof." Id. The only question, therefore, is whether there is a writing to evidence the agreement or an applicable exception to the Statute of Frauds.[5] To satisfy the Statute of Frauds, a writing must contain all the material terms of the contract. Citizens for Covenant Compliance v. Anderson, 906 P.2d 1314, 1323 (Cal. 1995). The writing must also be signed by the party against whom enforcement is sought. Cal. Civ. Code § 1624(a). Lamle argues that the June 26 email from Bucher satisfied both requirements.

The June 26 email specified the term of the license, the geographic scope, the percentage royalty, and the total advance and minimum amount to be paid under the contract. Bucher stated that these terms had "been agreed in principal [sic] by [his] superiors at Mattel subject to contract" and that the email message "covers the basic points." (Def. App. at 112.)

---

[5] Lamle argues that the Draft Agreement he sent to Mattel contained a termination clause that permitted the agreement to be performed within one year. Whether or not invoking a termination clause counts as "performance" of a contract we need not address because the Draft Agreement is not what is at issue. Lamle has presented no evidence that the oral agreement that he seeks to prove could have been performed within one year.

04-1151                                        9

California law is clear that "a note or memorandum under the statute of frauds need not contain all of the details of an agreement between the parties." Gold Seal Prods., Inc. v. RKO Radio Pictures, Inc., 286 P.2d 954, 967 (Cal. Ct. App. 1955) (quoting Gibson v. De La Salle Inst., 152 P.2d 774, 784 (Cal. Ct. App. 1944)). Rather, the statute only requires that "every material term of an agreement within its provisions be reduced to written form." Burge v. Krug, 325 P.2d 119, 123 (Cal. Ct. App. 1958). "If the court, after acquiring knowledge of all the facts concerning the transaction which the parties themselves possessed at the time the agreement was made, can plainly determine from the memorandum the identity of the parties to the contract, the nature of its subject matter, and its essential terms, the memorandum will be held to be adequate." Kaneko v. Okuda, 195 Cal. App. 2d 217, 230 (1961) (citing Brewer v. Horst & Lachmund Co., 60 P. 418, 419 (Cal. 1900)). What is an essential term "depends on the agreement and its context and also on the subsequent conduct of the parties." Seaman's Direct Buying Serv., Inc. v. Standard Oil Co., 686 P.2d 1158, 1162 (Cal. 1984), overruled on other grounds by Freeman & Mills, Inc. v. Belcher Oil Co., 900 P.2d 669 (Cal. 1995).

Mattel correctly points out that the June 26 email does not contain all the terms that Lamle asserts are part of the oral contract. In particular, Mattel correctly notes that Lamle alleges that Mattel (1) guaranteed to sell 200,000 units of Farook each year; (2) promised to sell Farook units to Lamle at cost; and (3) promised Lamle the right to approve or disapprove the design and packaging of Farook units. None of these terms appears in the June 26 email. Again, we think that there is a genuine issue of material fact as to the materiality of these terms. The Ninth Circuit, interpreting California law,

has stated that "the subject matter, the price, and the party against whom enforcement is sought" are the "few terms deemed essential as a matter of law by California courts." Levin v. Knight, 780 F.2d 786, 787 (9th Cir. 1986). A jury could well conclude that these omitted terms allegedly agreed to at the meeting but not reflected in the writing were not material.

A more difficult question is perhaps raised by Lamle's allegation of a provision bundling the computer version of Farook with the physical version. Lamle in his brief to this court (though not in his affidavit submitted in opposition to Mattel's summary judgment motion) appears to view it as significant, since he claims that, inter alia, Mattel's alleged promise to bundle was a "material misrepresentation." See (Br. of Appellant at 11, 32-34, 42.) Mattel, on the other hand, stated to Lamle that it was "not an obvious problem." (Def. App. at 112.) Again, we think that the materiality of this provision is not an issue susceptible to summary judgment.

B.

There remains the issue of whether an email is a writing "subscribed by the party to be charged or by the party's agent." Cal. Civ. Code § 1624. The party to be charged in this case is Mattel, and the June 26 email was written by Bucher, an employee of Mattel, and his name appears at the end of the email, which concludes with "Best regards Mike Bucher." (Def. App. at 112.) Mattel has not disputed the agency authority of Bucher to bind it. Therefore, the only question is whether Bucher's name on an email is a valid writing and signature to satisfy the Statute of Frauds.

If the email had been sent after January 1, 2000, there would be no question of its sufficiency under the Statute of Frauds because the Uniform Electronic Transactions

Act, Cal. Civ. Code § 1633.7 (2004), provides that a "record or signature may not be denied legal effect or enforceability solely because it is in electronic form." However, because the email was sent in 1997, we must evaluate its validity under California common law. The California Supreme Court has noted that decisions from other states "have relaxed the signature requirement [of the Statute of Frauds] considerably to accommodate various forms of electronic communication." Donovan v. RRL Corp., 27 P.3d 702, 713 (Cal. 2001). Nonetheless, the Supreme Court of California has never definitively decided whether email and electronic signatures made prior to 2000 satisfy the Statute of Frauds.

California law does provide, however, that typed names appearing on the end of telegrams are sufficient to be writings under the Statute of Frauds. McNear v. Petroleum Export Corp., 280 P. 684, 686 (Cal. 1929); Brewer, 60 P. at 419. California law also provides that a typewritten name is sufficient to be a signature. Marks v. Walter G. McCarty Corp., 205 P.2d 1025, 1028 (Cal. 1949). We can see no meaningful difference between a typewritten signature on a telegram and an email. Therefore, we conclude that under California law the June 26 email satisfies the Statute of Frauds, assuming that there was a binding oral agreement on June 11 and that the email includes all the material terms of that agreement.

CONCLUSION

To prove a contract with Mattel, Lamle must prove that the parties objectively intended to be immediately bound by an oral contract on June 11; that the June 26 email contains the material terms of that oral contract; and that Bucher had actual or apparent authority to sign for Mattel. Reviewing the record, Lamle has presented

04-1151                          12

sufficient evidence to create genuine issues of material fact on these points. This is not to say that Lamle should prevail at trial. Indeed, among other things, Lamle faces a difficult burden persuading the jury that, despite Mattel's stating that it would sign a formal contract later, the objective intention of both parties was to be immediately bound by the oral contract, and to abrogate a prior written agreement to the contrary.

We have reviewed the record and find Lamle's remaining claims to be without merit.[6] Therefore, we vacate the grant of summary judgment with respect to the breach of contract claim, affirm the grant of summary judgment with respect to all other claims, and remand for further proceedings consistent with this opinion.

<u>AFFIRMED-IN-PART, VACATED-IN-PART, AND REMANDED</u>

COSTS

No costs.

---

[6] Specifically: We reject Lamle's patent infringement claim on the basis that Lamle has presented no evidence that Mattel's activities were not authorized. We reject Lamle's intentional interference with economic relations claim on the basis that Lamle has produced no evidence of a wrongful act or wrongful intent by Mattel. We reject Lamle's Lanham Act claim as it was not raised below. We reject Lamle's RICO claim as it was not raised below. We reject Lamle's fraud claim because the theory presented on appeal (that Mattel should have disclosed its concerns about the bundling provision) was not raised below; as to the fraud claim rejected below (that breaching the alleged contract was itself fraud), it is now abandoned as it was not briefed on appeal.

# United States Court of Appeals for the Federal Circuit

04-1151

STEWART LAMLE,

Plaintiff-Appellant,

v.

MATTEL, INC.,

Defendant-Appellee.

NEWMAN, <u>Circuit Judge</u>, dissenting in part.

I cannot agree with the ruling that an enforceable contract can be found to have been entered into between Mr. Lamle and Mattel, for the parties agreed (twice) in writing that any obligation would be contained in a "formal written contract." As a matter of law, there can have been no patent license and manufacturing and sales agreement between Mattel and Mr. Lamle, when no such license and no manufacturing and sales agreement were ever entered into. Thus I must, respectfully, dissent from the court's decision, for it is founded on incorrect principles of law.

Mr. Lamle signed two standard Product Disclosure Forms, first with Mattel and then with Spears' Games, a Mattel subsidiary. Both of the signed Forms were as follows:

> I understand that this submission to you is not made in confidence and that no obligation is assumed by [Mattel, Inc./ Spears' Games] unless and until a formal written contract is agreed to and entered into, and then the obligation shall be only that which is expressed in the formal, written contract.

The Product Disclosure Form is not ambiguous; it makes the plain statement that any obligation shall be expressed only in a "formal written contract" that is "agreed to and entered into." It is undisputed that no such contract existed. The majority's remand so that a trier of fact can try to piece together an e-mail and oral testimony to ascertain where the parties were in their negotiations when Mattel decided not to develop the Lamle invention is contrary to the law of contracts and is a distortion of the practices of commerce.

Statute and precedent uniformly hold that when parties agree that their relationship shall take a certain form, that form is binding. See Ambler v. Whipple, 87 U.S. (20 Wall.) 546, 556 (1874) ("it is very clear that both parties intended to have a written instrument signed by each as the evidence of any contract they might make on that subject, and neither considered any contract concluded until it was fully executed. Under these circumstances . . . he was not bound by it.") Applying California law, indeed applying any law, if the parties agree that only a formal written contract will create an obligation, then there is no obligation other than by formal written contract. See, e.g., C.L. Smith Co. v. Roger Ducharme, Inc., 135 Cal. Rptr. 483, 487-88 (Cal. Ct. App. 1977) (no contract as a matter of law where parties intended agreement to be reduced to writing and agreement was not signed); Apablasa v. Merritt & Co., 1 Cal. Rptr. 500, 507 (Cal. Ct. App. 1959) (no contract where contract was "to be reduced to writing, and signed by the parties" and no written contract was signed); Durst v. Jolly, 35 Cal. App. 184, 187 (1917) ("where parties agree to reduce to writing contracts of a certain character whereby and wherein they propose to set forth the terms and conditions of the agreement verbally made with respect thereto, and fail to put their agreement in writing, there is a failure to make a completed

04-1151                                    2

contract or one that is binding upon either of the parties, and that an action on such an agreement cannot be maintained").

It is undisputed that there was no formal written contract to manufacture and license and sell Mr. Lamle's game, and that there were matters still unresolved when Mattel decided not to proceed. The panel majority's theory is that a cordial e-mail from a Mattel employee, stating some of the terms under discussion, can form an enforceable contract with material gaps filled by disputed oral testimony. Whether such a concoction can make a contract under any circumstances is highly debatable, but what is not debatable is that the parties agreed to be bound only by a formal written contract, and that a formal written contract did not exist.

The panel majority holds that the written commitment to a formal written contract can be disregarded, and that a trier of fact can assess damages based on whatever terms were agreed to in the course of the uncompleted negotiations. Precedent is uniformly contrary. See, e.g., Spinney v. Downing, 108 Cal. 666, 668 (1895) ("It is a general rule, to which this case presents no exception, that when it is a part of the understanding between the parties that the terms of their compact are to be reduced to writing, and signed by the parties, the assent to its terms must be evidenced in the manner agreed upon, or it does not become a binding obligation upon either."). New York law, the applicability of which is suggested by Mr. Lamle, is equally strong. See, e.g., Patrolmen's Benevolent Ass'n of the City of New York, Inc. v. City of New York, 267 N.E.2d 259, 261 (N.Y. 1971) (no contract where parties intended agreement to be reduced to a complete written contract). The Restatement of Contracts Second records the universal rule:

04-1151                                    3

§27, comment b. . . . If either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been reduced to another written form, the preliminary negotiations and agreements do not constitute a contract.

The record shows various oral and written exchanges between Mr. Lamle and Mattel representatives. As the negotiations continued, two additional formal written agreements were executed, in addition to the two signed Product Disclosure forms: there was a "standstill" agreement with a $25,000 payment by Mattel to Lamle, and there was a written extension of the standstill agreement. Neither of these agreements cancelled the requirement of a formal written contract; to the contrary, they illustrate the parties' intent and practice that any obligation, and any payment of money, would be placed in a formal written contract. Further to this intent and practice, a draft of a proposed patent license and manufacturing/sales agreement was submitted by Lamle, captioned "Draft Licensing Agreement." This draft agreement contained some provisions that were not reached by the negotiators, and others that were rejected, such as a term relating to computers that Lamle called a "dealbreaker" and that Mattel had rejected. On any criteria, there was not a completed contract.

When Mattel decided not to proceed with the Farook game Mr. Lamle may well have been disappointed, but the law is clear that no binding contract was created. "When it is clear . . . that both parties contemplated that acceptance of the contract's terms would be signified by signing it, the failure to sign the agreement means no binding contract was created." Banner Entertainment, Inc. v. Superior Court of Los Angeles County, 72 Cal. Rptr.2d 598, 603-04 (Cal. Ct. App. 1998). See also, e.g., Stromer v. Browning, 55 Cal. Rptr. 18, 22 (1967) (no oral contract "in view of the parties' agreement that no one would be

bound until written documents were executed").  Indeed, any oral patent license and manufacturing agreement would be subject to the California Statute of Frauds, discussed post, for the contract under negotiation could not be performed in one year.

The document that my colleagues describe as proving a binding oral contract, the June 26, 1997 e-mail from Mr. Bucher of Mattel, states that the terms included therein are "subject to contract," again negating the panel majority's proposition that Mattel somehow agreed that a formal written contract would no longer be needed.  The intention to abrogate an important written safeguard, and replace the requirement for a formal contract with an e-mail and oral testimony, must be mutual and clear.  Such an exotic step would itself have to be accompanied by sufficient formality to assure mutuality of understanding of the abrogation of the signed Product Disclosure Forms.  See Kessinger v. Organic Fertilizers, Inc., 151 Cal. App.2d 741, 750 (1957) ("[W]hen the parties to a proposed contract have themselves fixed the manner in which their assent is to be manifested, an assent thereto, in any other or different mode, will not be presumed.")

The record contains no objection by Mr. Lamle to entering into and complying with the written obligation that only a formal written agreement would be binding.  On remand, no trier of fact could find that this condition was somehow tacitly abrogated.  None of the cases cited by the majority supports this position.  The majority cites McKeon v. Giusto, 280 P.2d 782, 783-84 (Cal. 1955), which was concerned with a quite different situation: a written agreement had expired and there was debate about whether the parties intended that an oral agreement would become immediately effective; it was held that the parties entered into a valid oral agreement when the written agreement expired.  In contrast, the

Lamle/Mattel written agreement that required a formal written contract had not expired, but was in full force and was being respected in negotiation and draft.

The majority also cites <u>Pearsall v. Henry</u>, 153 Cal. 314, 317 (1908), which addressed the situation where a later written agreement replaced an earlier written agreement, and the court held that oral testimony was admissible as evidence of whether the second written agreement effected a novation. The <u>Pearsall</u> case does not suggest that a written commitment to place any future obligation in writing can be negated by disputed oral testimony. There is a large difference between the admission of parol evidence to explain what the parties intended when they entered an ambiguous contract, and the admission of parol evidence to abrogate a clear written provision that was critical to the entire relationship and fully understood.

Nor does <u>McCreary v. Mercury Lumber Distributors</u>, 124 Cal. App.2d 477, 483 (1954), provide support for the majority's novel approach to the law of contracts. In <u>McCleary</u> there was testimony by both parties, accompanied by the undisputed behavior of both parties, on the issue of whether the plaintiff repudiated a written contract for access when he "locked the gate in the fence" after defendant did not pay plaintiff and did not remove timber from the land. The question of repudiation of a written contract upon material failure of consideration is not relevant to the case at bar.

The fourth case relied on by the majority, <u>Tiburzi v. Dep't of Justice</u>, 269 F.3d 1346, 1352 (Fed. Cir. 2001), disfavors their position. In <u>Tiburzi</u> the ex-employee and ex-employer entered into an oral settlement at a hearing before the Merit Systems Protection Board, and the settlement terms were read into the hearing record by the administrative judge and accepted on the record by both sides. Thereafter the ex-employee refused to sign the

04-1151                                    6

written agreement that was proffered, stating that the terms were changed. This court held that he was bound by the agreement that he accepted as recorded in the hearing record. Here too, Lamle accepted the original Disclosure agreement, and is bound by it. The majority's purported analogy is obscure, for Lamle did not refuse to sign the two written Disclosure agreements, and the district court correctly held that he was bound by them. When Mattel decided not to license and market Mr. Lamle's game, and no formal written agreement had been entered into, Mattel was not liable for breach of a non-existent agreement.

The panel majority makes much of a June 26 e-mail from Mr. Bucher of Mattel, for that e-mail contained some of the provisions that the parties were negotiating. This e-mail explicitly says "subject to contract." Agreement cannot here be imposed when there was no signed formal agreement. It is irrelevant whether some of the contemplated terms were worked out and orally agreed to on June 11, for there was never a "formal written contract." The parties to a written contract are not free to modify it by a subsequent oral one, Cal. Civ. Code §1698, and may not orally abrogate a written contract unless both sides show a clear and unambiguous mutual intent to do so. The record does not support, or even hint at, such intent.

California law, indeed all contract law, is clear that when the parties intend to be bound only by a signed writing, there is no contract until a writing is signed. <u>Spinney v. Downing</u>, 41 P. 797 (1895); <u>see also</u> <u>Albany Peanut Co. v. Euclid Candy Co. of Cal., Inc.</u>, 85 P.2d 471, 473 (Cal. Ct. App. 1938) ("A mere promise to execute a written contract, followed by refusal to do so, is not sufficient to create an estoppel [with the effect of a contract], even though reliance is placed on such promise and damage is occasioned by

04-1151                                        7

such refusal.")  It is unsupportable for one party retrospectively to select an interim negotiation stage at which some of the contract terms were worked out, and impose a final and enforceable oral contract as to those terms.  The parties guarded against such uncertainty by requiring, in a signed writing, that there be a "formal written contract."  It is not legally available to nullify that commitment.

The panel majority unreasonably imposes the inference that soon after Mr. Lamle signed the Disclosure Agreements with Mattel and with its subsidiary Spears' Games, that Mattel abandoned these safeguards, sub silentio and without discussion.  Indeed, even as terms were resolved during negotiation, Mattel explicitly pointed out that the arrangement was "subject to contract."  There is no evidence at all, or any basis for inference, that Mattel intended to discard its written requirement of a written contract, and intended instead to be bound by piecemeal oral negotiations.  The district court was correct in its grant of summary judgment, for no commercial entity would deem the June 11 oral negotiations to be a binding contract when the parties had previously agreed that any obligation would only be by "formal written contract."

In addition, such an arrangement is barred by Cal. Civ. Code §1624(a)(1), for in order to produce the royalties and profits that Lamle seeks as damages for performance over more than one year, the Statute of Frauds requires a writing and that the writing contain all of the material terms of the contract.  "Recovery may not be predicated upon parol proof of material terms omitted from the written memorandum" for purposes of the Statute of Frauds.  Ellis v. Klaff, 216 P.2d 15, 19 (Cal. Ct. App. 1950).  See also, e.g., Burge v. Krug, 325 P.2d 119, 123 (Cal. Ct. App. 1958) ("The whole object of the statute

04-1151                                          8

would be frustrated if any substantive portion of the agreement could be established by parol evidence.").

It is undisputed that neither the June 11 conversation nor the Bucher e-mail contained all of the material terms of the patent license and manufacturing/sales arrangement that was being discussed. Nonetheless, this court holds that once the parties had agreed on some of the payment terms, the contract was made and damages may be due on whatever those terms embrace. It is not disputed that major terms were unresolved. California law negates this court's holding that a trier of fact can find an enforceable contract and award damages for its breach based on uncompleted negotiations:

> The California law is clear that there is no contract until there has been a meeting of the minds on all material points, despite the fact some terms have been agreed orally, or some action has been taken.

Grove v. Grove Valve & Regulator Co., 84 Cal. Rptr. 300, 312 (Cal. Ct. App. 1970); see also, e.g., Devereaux v. Harper, 26 Cal. Rptr. 837 (Cal. Ct. App. 1963) (no contract if "an essential element is reserved for the future agreement of both parties.")

The integrity of commerce requires fidelity to the rules of contract. Contracts are the foundation of commercial relationships, and are powerfully supported in the law. Business would come to a standstill if parties who are in negotiation will now risk that the Federal Circuit will allow an enforceable contract to arise at some unknown oral point during the negotiation. Routine contractual safeguards should be preserved, not negated, for contracts promote objectively reliable and enforceable trust, which in turn allows business to proceed. See F. H. Buckley, The Fall and Rise of Freedom of Contract 6-7 (Duke University Press 1999) ("in commercial contracts, trust is an instrumental goal"). There can

04-1151                                                    9

be no trust, no reliability, if the parties' agreement as to how they will work together is subject to judicial rearrangement. When the parties agree in writing that any commercial arrangement will be by formal written contract, the obligation of the court is to respect and enforce that commitment. From my colleagues' contrary ruling, I respectfully dissent.